**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **NICOLE SOLAS**, <br><br> *Plaintiff*, <br><br> *v.* <br><br> **TOWN OF SOUTH KINGSTOWN, SOUTH KINGSTOWN SCHOOL DEPARTMENT, SOUTH KINGSTON SCHOOL COMMITTEE, SARAH MARKEY**, *and* **EMILY CUMMISKEY**, <br><br> *Defendants*. | Docket No.: <br><br><br> **COMPLAINT AND JURY DEMAND** |

Plaintiff Nicole Solas, through her undersigned attorneys, by and for her Complaint against defendants South Kingstown School Committee, South Kingston School Department, Sarah Markey and Emily Cummiskey, alleges and complains as follows:

### NATURE OF ACTION

1.      Nicole Solas is a stay-at-home mother of two elementary-aged children and a resident South Kingstown, Rhode Island.

2.      In today's politically charged environment, where schools around the country are turning their classrooms into breeding grounds for bias and discrimination, Ms. Solas wanted to know if she was sending her daughter into an environment where she would be exposed to the controversial doctrines of Critical Race Theory, gender identity and the hate, guilt and racial bias these worldviews generated.

3.      Indeed, in 2020, the South Kingstown School Committee established the BIPOC Advisory Board to determine if school district policies did not promote "inclusivity" and "equity," for a more "inclusive and antiracist" district.

4.      Ms. Solas had a child attending kindergarten in the South Kingston school district and asked the school for information about the curriculum planned for her little one.

5.      The school, however, stonewalled her.

6.      Pressing the issue, Ms. Solas learned that the only way she could get the information she sought—basic facts about the school's curriculum, teaching materials and the like—was by filling out a state-mandated public records form and paying $74,000 in fees.

7.      Working her way through this bureaucratic thicket, Ms. Solas shortly found herself the subject of a five-hour-long public meeting at which the school district debated suing her for having the temerity to request curriculum information for her child.

8.      After a rush of national attention, the school district seemed to back down—until the local affiliates of the nation's largest teachers union—working hand in glove with the school district itself, on whose board—i.e., the School Committee—sits an officer of the teachers' union—sued for filing these records requests, even though that was exactly what school officials had required her to do.

## JURISDICTION AND VENUE

9.      This action arises under 42 U.S.C. § 1983 in relation to defendants' deprivation of plaintiffs' constitutional rights to freedom of religion, speech, and assembly, due process, and equal protection rights under the First and Fourteenth Amendments to the U.S. Constitution. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief and damages under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. § 1988.

10.      The District of Rhode Island is the appropriate venue for this action pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because it is the District in which defendants maintain offices and

exercise their authority in their official capacities, and it is the District in which substantially all of the events giving rise to the claims occurred.

## **PARTIES**

11.    Plaintiff is a resident of South Kingston, Rhode Island.

12.    Defendant the Town of South Kingston is a municipality in the State of Rhode Island with it headquarters at 180 High Street, Wakefield, Rhode Island.

13.    Defendant South Kingstown School Department is located at 307 Curtis Corner Road, Wakefield, Rhode Island and is a department of the Town of South Kingstown. ("School Department" or "district")

14.    Although it is a department of South Kingston's government, the School Department is one of 66 Local Education Agencies or districts in Rhode Island that operate under the aegis of the State of Rhode Island Department of Education.

15.    Defendant South Kingstown School Committee is located at 307 Curtis Corner Road, Wakefield, Rhode Island ("School Committee").

16.    The terms School Committee and School Department may be used interchangeably.

17.    Defendant Sarah Markey was at relevant times a member of the School Committee, and is currently a resident of 600 Park Avenue W Unit 1007, Denver CO 80205.

18.    Defendant Emily Cummiskey was at relevant times a member of the School Committee, and a resident of 104 Stoneway Road, South Kingstown, RI 028798.

19.    Each and every defendant has acted under color of state law with respect to all acts or omissions herein alleged.

## **FACTUAL ALLEGATIONS**

20.     South Kingstown is a town in, and the county seat of, Washington County, Rhode Island. Its population was 31,931 at the 2020 census. South Kingstown is the second largest town in Rhode Island by total geographic area.

21.     The public schools in South Kingstown are operated by the South Kingstown School Department, which, in turn, is overseen by the South Kingstown School Committee and the Rhode Island Department of Education.  Funding is provided in part by the Town of South Kingstown.

22.     "The Mission of the South Kingstown School Committee," according to its website, "is to provide leadership and oversight of community-supported goals, policies, and resources to make certain the South Kingstown public schools deliver a high-quality education for all students."

23.     The School Committee is committed, according to its website, to achieve district goals and priorities "through communication with students, staff, parents, community, business, and public officials."

24.     The School Committee website also states that the School Committee "exercises its authority as a whole and does not advance individual or constituent agendas."

25.     In fact, however, for the last decade, the dominant agenda advanced by the School Committee has been that of the National Education Association Rhode Island (NEARI) and its local affiliate, National Education Association South Kingstown (NEASK).

26.     NEARI and NEASK are affiliates of the National Education Association, one of the country's largest and most powerful public sector unions, representing over 2.3 million people nationwide.

27.     This influence is consistent with a national trend. Seven out of 10 school board elections are won by the candidate supported by the local teacher's union, according to a study by

4

the Manhattan Institute, which also observed as that school reform measures at the state level

> fizzled when local officials encountered resistance from teachers in the trenches. Even after states adopted tougher teacher evaluation laws, for example, most districts simply went through the motions—giving favorable ratings to most teachers and removing few low-performers. Likewise, when states passed new laws encouraging districts to replace union-favored salary schedules with performance-based pay, districts tended to demur in the face of educator resistance.

> Altogether, elected boards provide unions with another, often less competitive, political arena for them to shape education policy. Union power in American education, therefore, still hinges on the degree of influence that teachers' unions can exert in school board elections. It is these elections that determine whether the officials who will implement education policies will be sympathetic to unions' concerns or resistant to them.

28.     The policies favored by teachers' unions are consistently extreme, as explained by

an editorial published in the name of the Wall Street Journal Editorial Board:

> Parents didn't ask to be thrown into the trenches of America's culture war, but progressives aren't giving them a choice. Witness the way the national teachers unions are adopting woke values and pressing them into K-12 curriculums across the U.S.

> The National Education Association, the largest teachers union, held its annual meeting last week and the measures approved by delegates deserve broader attention. One calls for the union to support and lead campaigns that "result in increasing the implementation of culturally responsive education, critical race theory, and ethnic (Native people, Asian, Black, Latin(o/a/x), Middle Eastern, North African, and Pacific Islander) Studies curriculum in pre-K-12 and higher education."

> Critical theory is a neo-Marxist ideology that is pervasive in higher education and teaches that a person is defined above all else by race, gender and sexual orientation, and that American institutions are designed to ensure white supremacy and "the patriarchy."

29.     Indeed, recently teachers' unions have made it clear that they deem their domain to

encompass essentially infinite moral, policy and cultural scope, as another published report noted:

> In 2022, the nation's teachers unions focused on pushing gender identity and Critical Race Theory (CRT) into the classroom.

> Teachers union chapters hosted drag queen story hours, provided schools with LGBTQ ally badges and vowed to compile a list with information on the "opposition."

> "Teachers' unions are one of the country's largest special interest groups pushing progressive politics. The NEA and AFT combined spent over $100 million on political activities last year." Brigette Herbst, senior organizing director at Americans for Fair

Treatment, a group focused on educating employees on their rights within unions, told the Daily Caller News Foundation.

Throughout 2022, teachers unions across the country turned their attention to initiatives such as gender identity educational materials and reading lists promoting political protest.

30.    NEARI's commitment to this political and cultural program are demonstrated amply by its activities and publications, including, by way of example, on a web page entitled, "Racial and Social Justice" found at https://www.neari.org/community/racial-social-justice-committee, which features items ranging from celebration of the life of Martin Luther King and the rights of disabled students to "Climate Justice," "Supporting our LGBTQ+ Students" ("in partnership with the NEA LGBTQ+ Caucus"), "Black Lives Matter @ School" and links to resources relating to transgender schoolchildren.

31.    The political and cultural values of NEARI and NEASK, and its dominance on the School Committee, have been consistent with both national trends discussed in the passages excerpted above.

32.    Thus, despite a 2019 opinion by School Committee attorney Sara Rapport that School Committee member Sarah Markey could not serve on the committee because of her NEARI employment, Markey remained on the committee after a state ethics board ruled that she need only recuse herself in connection with "union-related' issues—notwithstanding that, as shown above, teachers' unions regard the entire operation of public schools to be subject to their moral and cultural guidance.

33.    After plaintiff Nicole Solas' child was enrolled in kindergarten in South Kingstown, she became concerned that Critical Race Theory (CRT) and gender theory were integrated into lessons when an elementary school principal told her that teachers don't refer to students as "boys" and "girls."

34.     Additionally, she was told that the kindergarten teacher asks five-year-olds, "what could have been done differently on the first Thanksgiving" to build upon a "line of thinking about history and the ideals of gender identity are embedded into the lessons without a set curriculum."

35.     The school's response to Ms. Solas' inquiries as to why children could not be called "boys" and "girls" was that this was "common practice."

36.     When Ms. Solas asked for clarification on the school's "line of thinking" about history, she got no answers.

37.     When Ms. Solas then asked for a tour of the elementary school and the Superintendent offered her an in-person or virtual tour but refused to provide a date and time despite numerous follow-up emails and phone calls by Ms. Solas.

38.     After almost a month of radio silence the Superintendent finally advised Ms. Solas that such tours were no longer available due to Covid restrictions.

39.     In fact, the Superintendent conducted school tours to campaign for a school bond during the same period.

40.     In April 2021, Ms. Solas sent an e-mail to the principal of a South Kingstown public school requesting records and information regarding the teaching of critical race theory and other related concepts within the South Kingstown school's curriculum because her child was a prospective kindergartener in the South Kingstown public school system.

41.     She also asked to see the elementary school curriculum. Ms. Solas asked the principal, the school committee, the superintendent, the director of curriculum, and even the legal department at the Rhode Island Department of Education to allow her to view the curriculum.

42.     The school's Director of Curriculum told her she was unavailable and never responded when Ms. Solas said she could come in to see the curriculum on any day and time.

7

43.     A school committee member subsequently directed her to file an Access to Public Records Act (APRA) request on the school district website to obtain the curriculum.

44.     After thirty days, Ms. Solas received an incomplete curriculum and filed an APRA complaint with the Attorney General.

45.     At this point, Ms. Solas had reason to believe that the school district was hiding information and deliberately stonewalling her, and she started using the APRA request Google link on the school district's website to request public documents that might answer her questions about CRT, gender theory, and other related, but—for a parent of a young child—relevant concerns about the district's policies and governance.

46.     Under the APRA, "a reasonable charge may be made for the search or retrieval of documents. Hourly costs for a search and retrieval shall not exceed fifteen dollars ($15.00) per hour and no costs shall be charged for the first hour of a search or retrieval." Additionally, each copy costs 15 cents.

47.     When Ms. Solas requested information regarding the union activism of a School Committee member the estimate of what this would cost came back as $9,570.

48.     Because of this high cost, Ms. Solas amended her request to narrow the scope of requested materials to six months and requested digital copies instead of hard copies, which resulted in a reduction of cost from the estimated $9,570 to $79.50.

49.     Ms. Solas quickly realized that if she structured many specific and narrow requests, she could afford to purchase the public information that was otherwise inaccessible to her due to the non-responsiveness of the South Kingstown school leadership and its charging of excessive fees for public records for purposes of discouraging her.

50.    Ms. Solas continued to submit small and numerous public record requests to investigate the school district where, as a resident and taxpayer, she had hoped to educate her children.

51.    Ms. Solas also filed APRA complaint with the Rhode Island Attorney General, which she later won

52.    Ms. Solas' records requests sought several categories of materials, including documents related to labor relations and the involvement of union officials in setting policy in the district.

53.    Ms. Solas' requests also sought information relating to teacher discipline and performance, because of her concerns about issues such as teacher quality, the handling of parent complaints and inquiries and other matter relating to education in South Kingstown.

54.    The School Department consistently responded in the statutory period of ten days.

55.    No one in the School Department ever told Ms. Solas that her APRA requests were a problem in the course of her nearly daily contact with them requesting and purchasing information.

56.    Ms. Solas purchased over $300 worth of public information and shared it to a private Facebook group to raise awareness about indoctrination in Rhode Island schools. Ms. Solas developed a growing network of like-minded teachers, parents, and community members who gave her information about CRT and gender theory infiltrating Rhode Island school districts.

57.    Despite the technical cooperation, in fact, there was considerable tension growing between Ms. Solas and the School Committee concerning her APRA requests and other online research and advocacy activities.

58.    This was evidenced by increasingly terse email exchanges between Ms. Solas and School Committee representatives through May of 2021.

59.    Unbeknownst to Ms. Solas, on May 19, 2021, South Kingstown Superintendent Linda Savastano emailed NEARI and NEASK officials, in her professional capacity as Superintendent, to "alert" them—her word—that Ms. Solas' APRA requests made her a "threat to equity and an antiracist culture" in the school district.

60.    Superintendent Savastano also emailed teachers, in her capacity as Superintendent, about Ms. Solas' APRA's, stating that she "want[ed] building leadership to talk to those teachers."

61.    On information and belief, by "building leadership" the South Kingstown Schools Superintendent was referring to union leadership, which for all practical purposes was one and the same with the district's administrative leadership.

62.    Superintendent Savastano also emailed the School Committee a set of Ms. Solas' first 66 APRA requests to notify them that administrative work may be delayed because of them, adding, "now more than ever we need to stay focused on our commitment to equity."

63.    On information and belief, by appending a statement about the district's "commitment to equity' to what was seemingly an unrelated email relating to Ms. Solas' APRA requests, the South Kingstown School Superintendent was hinting to administrators that based on their ideological commitment to "equity," they should now slow-walk and, presumably, provide less revealing responses to Ms. Solas' requests.

64.    Indeed, on May 21, 2021, the district responded to Ms. Solas that it had no documents responsive to her inquiry regarding who calculates estimated costs to respond to APRA requests—a patently false response.

65.    Little more than a week later, on May 29, 2021, the district informed Ms. Solas that the estimated cost of providing six months of emails for one School Committee member, Kate Macinanti, would be $2,640.

66.    This amount represented a remarkable increase from the previous estimate of $79.50 to provide emails of another School Committee member, Sarah Markey.

67.    In response to an inquiry to the district's lawyer as to why there had been such a massive increase, the attorney responded the school had underestimated the volume of Markey's emails and now had "a more accurate process," which she did not describe, for generating such estimates.

68.    On May 28, 2021, the School Committee set an agenda item for a public meeting to discuss "filing litigation against Nicole Solas to challenge the filing of over 160 APRA requests."

69.    There is no limit under APRA to submitting public record requests.

70.    Indeed, what began as a controversy over an individual mother seeking information now blossomed into a larger issue that revealed efforts by school officials to fight back against parents allegedly associated with "right-wing" groups such as Parents Defending Education (PDE).

71.    On May 31, 2021, the School Department assured the unions that it would not release any teacher emails, regardless of the requirements of APRA.

72.    Ms. Solas was also now targeted by School Committee Chair Emily Cummiskey, who accused Solas of being connected to a "national racist group" in the Providence *Journal*. The newspaper quoted Cummiskey as saying that the School Committee was considering a "potential injunction" against Ms. Solas to blunt "a nationally-organized, racist group [attempting] to create chaos and intimidate our district. ...This is their MO nation-wide. Cummiskey added that she anticipated "other districts in our state will soon experience the same unfortunate influx we have."

73.    Cummiskey repeated this false and preposterous claim in a Facebook post which, upon information and belief, was also emailed to South Kingstown residents before the June 2, 2021, meeting.

11

74.     The same intemperate and scandalous language was used in communications among School Committee members, school employees as well as officials of three unions: the Rhode Island School Superintendents Association (RISSA), NEARI and NEASK.

75.     At the same time, Timothy Ryan, a RISSA lobbyist, identified the group responsible for "bombarding" school officials with public records requests as Parents Defending Education, telling the Journal that members of this group "want to cripple" the South Kingstown schools as officials are busy with next year's budget and pandemic rules."

76.     Parents Defending Education is a national group founded by Nikki Neily, who is neither racist nor "white."

77.     PDE is not, moreover, a membership organization, and Ms. Solas had and has no affiliation with the group.

78.     The Access to Public Records Act prohibits a government body from compelling a citizen to justify or explain her requests for public information. Around the same time, however, RISSA, circulated draft legislative language that would give public agencies, including school districts, the right to declare requests excessive and require the Attorney General's Office to resolve the dispute. This would create substantial delay and would divest the public of the presumptive right to public records.

79.     The amendment circulated by Tim Ryan, lobbyist for RISSA, would have provided as follows:

> In the event any request or series of requests for public documents under this statute to a single recipient is considered to be overly burdensome, that the recipient may request that the Attorney General intervene to form a reasonable compliance plan.

> Such request must be made within ten business days after receiving the request. The Attorney General shall consider all such requests, determine if compliance within the terms of the statute are unduly burdensome to the recipient, and upon such finding shall

develop a compliance plan. The Attorney General is authorized to waive any timelines in this statute in its compliance plan.

80.     Significantly, in internal communications, RISSA's Ryan suggested to the Superintendents that the Rhode Island ACLU, through its local Director Steve Brown, was "open" to changing APRA.

81.     If that were true, and the RIACLU were on board with the language proposed by the school superintendents, such an endorsement would be very significant, because the RI ACLU has been a champion of the public records law, even publishing a handy guide to using the statute for the public.

82.     At least one school committee member took to lobbying other members by telephone to vote in favor of suing Ms. Solas at the upcoming June 2, 2021 meeting specifically because of her political views.

83.     On the day of the South Kingstown meeting, June 2, at 1:37 p.m., Ryan emailed numerous superintendents and others about the legislative efforts, writing as follows:

> Good Afternoon,
>
> I've been working hard on the APRA request from the Parents Defending Education Group:
>
> • I've been in touch with Linda about tonight's SK School Committee meeting and the media
> • Ms. Solas spoke with Steve Brown of the ACLU and he's open to amending the law to deal with excessive APRA requests
> • Ms. Solas forwarded the conversation with the ACLU to the Speaker's Office
> • Tim Duffy and Ms. Solas are in touch with our union friends.
>
> Tim

84.     Tim Duffy was President of the Rhode Island Association of School Committees (RIASC).  Duffy would later volunteer RIASC's assistance to U.S. Attorney General Merrick Garland in connection with his now notorious October 2021 Memorandum instructing the FBMs.

Solas and other federal agencies to coordinate with other federal agencies and state and local law enforcement concerning "an increase in harassment, intimidation and threats of violence against school board members, teachers and workers in our nation's public schools" – an action by the Department of Justice that was spurred by a letter sent by two top officials of The National School Boards Association President Biden that the Association subsequently repudiated.

85.     The claim in Ryan's email suggesting that Rhode Island ACLU Executive Director Steve Brown had said the RI ACLU was "open" to amending APRA along the lines urged by RISSA, was inaccurate.

86.     NEARI / NEASK member Tara Apperson, co-founder of a local bookstore called "The Collective," sent an email to allies to attend the School Committee meeting.

87.     In fact, the RI ACLU's Brown later issued a statement to the effect that while addressing "abusive" requests may be an acceptable reason to amend APRA, the RI ACLU opposed "the only version of an amendment [he had] seen, and we would not support a bill that simply gave the Attorney General blanket authority to make such a determination."

88.     Indeed, before the School Committee meeting took place and after it became clear that the subject of suing Nicole Solas over her APRA requests were to be the main agenda item, Brown told a local media outlet that the South Kingstown School Committee's response was "inappropriate," adding, "I can certainly understand the difficulties facing a municipal body when confronted with such a huge number of APRA requests in a short period of time. However, I am also hopeful that, upon consideration, the school committee will recognize that suing a resident for this activity is not an appropriate response."

89.     Ms. Solas' dispute with the School Committee, in fact, had begun to attract national attention, first being reported in a well-known legal blog headquartered in Rhode Island, "Legal

Insurrection," with the story eventually being reported in national media including The Ingraham Angle, Tucker Carlson Tonight, Newsmax National Report, and National Review and New York Post.

90.    The meeting nonetheless proceeded, although at no time was Ms. Solas provided with notice by the School Committee that she and her APRA requests, and those of her husband, were to be the main topic on the agenda.

91.    After formerly opening the meeting, the School Committee went into Executive Session for almost an hour.

92.    When the School Committee returned, a statement similar to Cummiskey's Facebook post and statements in the Providence Journal were read out loud by a Committee member, who specifically described Parents Defending Education as a "racist" organization in the open meeting.

93.    The speaker offered neither proof for this description of PDE as racist nor proof of any connection between Ms. Solas and PDE.

94.    The Committee then heard from a member who stated that it had received 251 APRA requests since April 25, 2021, of which 50 were not from Ms. Solas.

95.    The Committee then projected slides breaking down the types of requests, including those submitted by Ms. Solas' husband.

96.    The Committee acknowledged during this presentation that it had made no attempt to resolve its concerns with Ms. Nicole before placing litigation against her for utilizing APRA—which she had been instructed to do by school authorities—on the meeting agenda.

97.    In the course of the discussion, Superintendent Savastano stated that the school did not have any "codified curriculum," which was false.

98.     Indeed, as noted above, Ms. Solas subsequently initiated and won an APRA complaint proceeding alleging the district improperly withheld the complete documentation regarding the district's curriculum from Ms. Solas' APRA request.

99.     In fact, Rhode Island law provides as follows:

> The school committee shall make and cause to be put up in each schoolhouse rules and regulations for the attendance and classification of the pupils, for the introduction and use of textbooks and works of reference, and for the instruction, government, and discipline of the public schools, and shall prescribe the studies to be pursued in the schools, under the direction of the department of elementary and secondary education.

R.I. Gen. Laws § 16-2-16.

100.    In other words, Ms. Solas had an absolute statutory right to see the curriculum and instructional materials she was forced to apply for through APRA, as did any member of the public.

101.    During the meeting, School Committee member Sarah Markey—who is also a NEARI Executive—tweeted "this fight vs CRT" about Ms. Solas' attempt to obtain information from the district about its curriculum.

102.    Markey later deleted her tweet.

103.    On information and belief, Markey deleted her tweet in anticipation of the Teacher Union lawsuit to give the appearance of "distance" between NEARI and the School Committee.

104.    Markey was the other co-founder of The Collective, where NEARI's Tara Apperson gathered union activists to attend the meeting in opposition to Ms. Solas.

105.    On information and belief, NEARI Executive and School Committee member Markey was aware of and involved in this meeting.

106.    Despite her vociferous online and other public advocacy against Ms. Solas, Markey was absent from the June 2, 2021 meeting, supposedly due to "health issues."

107.    On information and belief, Markey recused herself from these proceedings in anticipation of the Teacher Union lawsuit to give the appearance of "distance" between NEARI and the School Committee.

108.    After additional discussion, including a statement from Ms. Solas, one of the Committee members introduced a motion that the Committee not initiate litigation against Ms. Solas but rather to direct its legal counsel to "seek mediation." The motion passed unanimously.

109.    Although the School Committee voted against suing Ms. Solas, the district's union-inspired campaign against her only accelerated after the meeting.

110.    Throughout June and July, teachers, residents, and parents sent emails to the South Kingstown Town Council complaining about Ms. Solas and her use of APRA, referring to her using coded language lifted from teacher union rhetoric.

111.    On June 7, 2021, NEASK held a Zoom meeting about Ms. Solas, featuring slides of her face.  Two hundred and fifty South Kingstown teachers were in attendance.

112.    On June 8, 2021, School Committee Chair Emily Cummiskey resigned and claimed that the defamatory statements against me had been prepared by an unnamed public relations firm.

113.    On June 16, 2021, Cummiskey co-authored, along with RISCA's Tim Duffy, an op-ed in the Providence *Journal* about Ms. Solas' "frivolous" APRA's, stating, "The General Assembly should explore legislation to address unreasonable and frivolous APRA and freedom of information requests. . . .  That is an issue that needs to be addressed by the highest law enforcement agency in the state, the attorney general."

114.    On June 6, 2021, RISSA contacted the Rhode Island ACLU and state legislators to propose an amendment to the APRA that would allow the state Attorney General to limit APRA requests of one requestor.

115.    On June 22, 2021, district counsel Aubrey Lombardo provided an "APRA update" in the school committee meeting and stated falsely that Ms. Solas "rejected mediation."

116.    In fact, the district did not offer or propose "mediation"; it simply emailed Ms. Solas's attorney asking for a 60-day extension to respond to her APRA's, in exchange for no consideration.

117.    On July 2, 2021, NEARI Executive Assistant Sarah Markey resigned from the School Committee.

118.    On information and belief, Markey resigned from the School Committee in anticipation of the Teacher Union lawsuit to give the appearance of "distance" between NEARI and the School Committee.

119.    On July 13, 2021, the attorneys for the unions and the School Committee communicated by telephone and email.

120.    On July 20, 2021, the School Committee met in executive session to discuss "NEASK APRA Requests (RIGL 42-46-5(a)(2) litigation)."

121.    RIGL 42-46-5(a)(2) refers to the Rhode Island Open Meetings Act, but no litigation involving that law was pending, or had been threatened, at that time; moreover, this statutory provision has nothing to do with APRA.

122.    On information and belief, the discussion during this executive session was related, not to litigation by the School Committee or the School Department, but litigation against Ms. Solas by their proxies, NEARI and NEASK.

123.    On August 4, 2021, Ms. Solas was served with a lawsuit filed by NEARI and NEASK seeking injunctive relief to prevent South Kingstown from providing her with the information she

had requested  (the "Teachers Union Lawsuit").  A copy of the Teachers Union Lawsuit is attached hereto as Exhibit A.

124.    Although, as alleged above, South Kingstown Superintendent Linda Savastano had expressed her concerns to NEARI and NEASK officials in May that Ms. Solas' requests were a about her APRA requests to "alert" them about Ms. Solas' APRA's as a "threat to equity and an antiracist culture" in the school district, the union narrative changed to protecting "teacher privacy," and indeed the allegations in the Teachers Lawsuit focused on communications involving the union or its members.

125.    Although the Teachers Union Lawsuit named the School Committee and the School District as defendants, upon information and belief the filing of the lawsuit was in fact the product of collusion among the South Kingstown school administrators and the unions.

126.    As the Teachers Union Lawsuit makes clear, the School Committee has made every effort to avoid providing Ms. Solas with the information she sought, and even went so far as to put litigation against her on the literal agenda.

127.    Upon information and belief, the School Committee blanched at proceeding with a lawsuit when the national spotlight was shined on Ms. Solas, but nonetheless proceeded with a five-hour-long public "struggle session" targeting her and her family personally in the expectation that she would be intimidated into ceasing her activism.

128.    This strategy failed, however, and the School Committee then, upon information and belief, recruited the unions to do the job for them.

129.    The Teachers Union Lawsuit purported to prevent disclosure of "private" information, but the public records laws and Ms. Solas' requests pursuant to those laws only require the district to produce public records.

130.    The appearance of collusion between the School Committee and the unions appeared to be confirmed when, shortly after the suit was filed, a local television station the Executive Director of NEARI, who suggested that the unions would be happy to dismiss Ms. Solas and her husband from of the lawsuit: "'The only reason she's named in the complaint is law requires all interested parties to be named in the complaint—this is not a dispute with her at all,' Walsh said. 'This case has nothing to do with Nicole Solas.'"

131.    If Ms. Solas had agreed to this, however, the unions and School Committee could have entered into a collusive agreement to withhold exactly the kind of information Ms. Solas sought through the filing of her APRA requests—something they could not do without the lawsuit—and something that, once dismissed from the lawsuit, Ms. Solas could not prevent.

132.    Refusing to participate in this ruse, Ms. Solas declined to stipulate to dismissal, and the Teacher Union Lawsuit continued.

133.    The unions used their considerable influence to attract the support of other Rhode Island officials and punish Ms. Solas for standing in their way by expressing her views and seeking information about the South Kingstown schools.

134.    For example, on September 19, 2022, Rhode Island Senator Kendra Anderson tweeted that she reported Ms. Solas to Twitter and claimed that her report got Ms. Solas banned from Twitter. On September 24, 2022, Rhode Island legislators Brandon Potter and Tiara Mack participated in an online smear campaign against Ms. Solas for holding a private event about gender ideology in school, which was reported in the Daily Mail. On information and belief, these officials acted at the behest of the Rhode Island school unions.

135.    On October 24, 2022, Rhode Island Attorney General Neronha gave a local radio interview in response to Ms. Solas' criticism of his "muting" of 152 Twitter accounts. He

complained that Ms. Solas constantly criticized him and that he considered many of her complaints concerning the School Committee frivolous, notwithstanding his office never made a finding of frivolousness concerning any of her adjudicated complaints.

136.    On March 14, 2023, the School Department served Ms. Solas with a legally deficient "offer of judgment" in a separate lawsuit involving an unlawful denial of an APRA request, which was merely another intimidation tactic in a pattern of abuse and harassment by the school district over the past three years.

137.    In May of 2024, Rhode Island Superior Court Justice Joseph McBurney approved a consent judgment between Ms. Solas, the School Committee and the School Department pursuant to which the district was to "provide Plaintiff with copies of the responsive records forthwith and at no cost to Plaintiff." The court also approved the parties' consent for the school district to pay attorney's fees, as well as a civil fine against the school district.

**FIRST CLAIM FOR RELIEF**
**Deprivation of Civil Rights Under Color of State Law**
*Speech Clause of First Amendment to U.S. Constitution*
**(42 U.S.C. § 1983)**

138.    Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

139.    Upon information and belief, defendants acted in concert to assert, in the names of defendants NEARI and NEASK, an action against Ms. Solas in Rhode Island Superior Court, as set forth in Exhibit A, for the purpose of retaliating against her for speech, political activities and related activism in connection with the South Kingstown School Committee and intimidating her from continuing the same conduct in the future.

140.    Ms. Solas' activities constituted free speech and the right to petition the government protected by the United States Constitution.

141.    Defendants the School Committee and the School Department acted under the color of state law at all relevant times.

142.    Defendants NEARI and NEASK and the Individual Defendants acted in full and voluntary concert with the School Committee and the School Department in the efforts by the School Committee and the School Department to censor and chill Ms. Solas' political speech and petition of the government.

143.    Defendants jointly acted in concert to abridge Ms. Solas' freedom of speech and deprive her of her First Amendment rights.

144.    By virtue of her rights to freedom of speech and to petition the government, Ms. Solas has a clearly established right to be free from suits filed against him by state actors attempting to restrain those rights or retaliate against him for exercising those rights.

145.    A reasonable school official knew or would have known that it was unlawful to file suit against Ms. Solas to enjoin her First Amendment rights to freedom of speech and to petition the government.

146.    By taking legal action against Ms. Solas in a suit for permanent injunction, damages, and attorneys' fees, defendants caused an injury to Ms. Solas that would chill a person of ordinary firmness from continuing to engage in these constitutionally protected activities.

147.    Defendants' actions deprived Ms. Solas of fundamental rights secured by the Constitution and laws of the United States of America.

148.    The protected activity, Ms. Solas' speech which defendants found objectionable, was a substantial motivating factor in Defendants' decision to censor Ms. Solas' speech.

149.    Defendants' speech-chilling actions specifically and objectively infringed Ms. Solas' speech rights under the United States Constitution.

150.    There was a clear nexus between defendants' actions and the intent to chill Ms. Solas' speech.

151.    Ms. Solas suffered economic and reputational injuries, among others, as a result.

## SECOND CLAIM FOR RELIEF
### Fourteenth Amendment – Equal Protection Discrimination
#### *Speech Clause of First Amendment to U.S. Constitution*
#### (42 U.S.C. § 1983)

152.    Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

153.    Defendants acted to censor and chill Ms. Solas' speech with discriminatory intent based on the content of her speech and activism.

154.    Defendants' actions bear no rational relation to a legitimate end as their conduct here was malicious, irrational, or plainly arbitrary.

155.    Even if Defendants did have a rational basis for their acts, their alleged rational basis was a pretext for an impermissible motive.

156.    Defendants discriminatorily abused legal process and engaged in a public campaign of personal vilification against Ms. Solas based on her viewpoint.

157.    Similarly situated individuals were not sued or discriminated against for the same or materially similar protected conduct by Ms. Solas.

158.    Defendants' actions had and continue to have a discriminatory effect.

159.    Defendants were and are motivated by a discriminatory purpose.

160.    Ms. Solas has no adequate remedy at law and will suffer serious and irreparable harm to his constitutional rights unless defendants are enjoined from violating her constitutional rights in the future.

161.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Ms. Solas is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief.

162.    Ms. Solas finds it necessary to engage the services of private counsel to vindicate her rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**THIRD CLAIM FOR RELIEF**
**Civil Conspiracy to Interfere with Civil Rights**
***Speech Clause of First Amendment to U.S. Constitution***
**(42 U.S.C. § 1985)**

163.    Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

164.    Defendants had a meeting of the minds to violate the constitutional rights of individuals who challenged the political and cultural agenda they sought to promote in the South Kingston schools and to hide this activity from the parents of children attending those schools.

165.    Defendants, through agreements and processes they jointly created to censor, punish and silence speech with which they disagreed or petitioning of the government they considered threatening to their agenda, intended to accomplish the unlawful objective of abridging such persons' freedom of speech.

166.    Ms. Solas is one such person.

167.    NEARI, NEASK and the Individual Defendants joined with the state agents, the School Committee and the School Department, to deprive Ms. Solas of her rights jointly.

168.    Each conspiracy participant shared the common objective of the conspiracy, to censor speech which they found objectionable or to quash petitioning of the government they disfavored, or, to use their own words, anyone who was a "threat to equity and an antiracist culture" in their district.

169.    As a result of their agreement, defendants actually deprived Ms. Solas of her First and Fourteenth Amendment rights, as described herein.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against defendants as follows:

A.    For general and special damages in an amount to be determined at trial.

B.    For punitive damages in an amount to be determined at trial;

C.    For attorneys' fees and costs;

D.    For pre- and post-judgment interest as allowed by law; and

E.    For such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff demands trial by jury in this action of all issues so triable.

DHILLON LAW GROUP, INC.
A California Professional Corporation

By: /s/RONALD D. COLEMAN
*(Pro hac vice admission pending)*
50 Park Place, Suite 1105
Newark, NJ 07102
973-298-1723
rcoleman@dhillonlaw.com

/S/GREGORY P. PICCIRILLI, ESQ. BAR NUMBER #4582
Law Office of Gregory P Piccirilli
2 Starline Way #7
Cranston, RI 02921
401-578-3340
gregory@splawri.com
*Attorneys for Plaintiff Nicole Solas*

Dated:  August 5, 2024